# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
_____
                                          )
OLZIE PERRY,                              )
                                          )
                    Plaintiff,            )
                                          )
        v.                                )        Civil Action No. 09-1149 (ESH)
                                          )
ERIC K. SHINSEKI,                         )
        Secretary, United States Department)
        of Veterans Affairs              )
                                          )
                    Defendant.            )
_____ )
```

## <u>MEMORANDUM OPINION</u>

Plaintiff Olzie Perry was not promoted to the position of Chief of Operations of the

National Cemetery Administration, Memorial Programs Service ("Service"), and now sues her

long-time employer, the United States Department of Veterans Affairs ("VA"), alleging

discrimination on the basis of race and gender in violation of Title VII of the Civil Rights Act of

1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), and discrimination on the basis of age in

violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.*

("ADEA"). The VA has moved for summary judgment. For the reasons set forth below, the

VA's motion will be granted.

## BACKGROUND

### I.      FACTUAL HISTORY

Perry, a 51-year old African-American woman,[1] began her career with the VA in 1986, as

a secretary. (Def.'s Statement of Material Facts ["SOMF"] ¶¶ 1, 3.) She currently works as a

Program Analyst (a GS-13 level position) in the Service, a subdivision of the VA's National

---

[1] The ages given for all relevant persons are as of the date of the employment action at issue in the case.

Cemetery Administration.  (*Id.* ¶ 2.)  Before joining the VA, she spent less than a year in the armed forces, before being discharged because of an injury.  (*Id.* ¶ 29; Def.'s Mot. for Summ. J., Ex. 9, Supp. Dep. of Olzie L. Perry [Supp. Perry Dep.], at 13.)

The period relevant to this case begins in late 2000, when Perry was reporting to David Schettler, the Acting Director of the Service.  (Pl.'s Opp'n to Def.'s Mot. for Summ. J. [Pl.'s Opp'n], Ex. 1, Decl. of Olzie Perry ["Perry Decl."] ¶ 7.)  Perry worked as a Supervisory Management & Program Analyst at the time.  (*Id.*)  One of Perry's duties was to interview candidates for a position as a programs analyst.  (*Id.* ¶ 10.)  Although the position apparently reported to Perry (*id.* ¶ 11), the duties were that of a staff assistant to Schettler.  (Pl.'s Opp'n, Ex. 24, Dep. of Lindee Lenox ["Lenox Dep.], at 62.)  Perry was told by Schettler that Don Murphy, a Site Supervisor with the Service, had applied for the position and should be considered.[2]  (Perry Decl. ¶¶ 7, 11.)  Perry did not believe he "interviewed well," but Schettler recommended Murphy as "a good person for the job."  (*Id.* ¶ 11-12.)  Perry hired Murphy, based on this recommendation.  (*Id.* ¶ 13.)  After eight months, Schettler promoted Murphy to Program Specialist.  (*Id.* ¶ 15.)

In June 2001, Schettler hired Lindee Lenox as the Chief of Operations.  (Perry Decl. ¶ 16; Lenox Dep. at 71.)  Perry had also applied for the job but was not hired.  (Perry Decl. ¶ 16.)  After Lenox became Chief, Perry began working directly for Schettler as a Quality Assurance and Improvement Specialist.  (*Id.* ¶ 17.)  She worked in this capacity from December 2002 until March 2005.  (*Id.*)  In March 2005, she went to work for Lenox, who had replaced Schettler as the Director of the Service.  (*Id.* ¶ 18.)  Lenox's promotion created a vacancy at the position of Chief of Operations.  (*Id.*)

---

[2] Schettler had supervised Murphy from the late '90s until 2000 or 2001.  (Pl.'s Opp'n, Ex. 22, Dep. of David Schettler ["Schettler Dep."], at 18.).  Schettler testified that he thought Murphy was "a good man," and that he didn't want to "lose him" to another agency.  (*Id.* at 21.)

On December 9, 2005, Perry met with Lenox, a 52-year old Caucasian woman (Pl.'s Opp'n, Ex. 21, Agency's Mot. for Summ. J., at 4), for her annual performance review. (Supp. Perry Dep. at 153; Perry Decl. ¶ 20.) During the review, Perry mentioned to Lenox that she planned on applying for the Chief position. (Perry Decl. ¶ 20.) According to Perry, Lenox asked "when are you going to retire?" (Perry Dep. at 153.) When Perry asked Lenox why she wanted to know, Lenox replied "no particular reason."[3] (Perry Decl. ¶ 20.)

In February 2006, Perry, who was 51 at the time, applied for a position as the Chief of Operations Program Analysis Officer (a GS-14 level position) in the Cemetery Administration. (SOMF ¶ 3.) Rhonika Howard, a member of the Administration's human resources office,[4] reviewed the various applications for the position and determined that Perry and six others were minimally qualified. (Id. ¶ 4.) Howard was only involved for this part of the selection process and took no part afterward until Lenox formally selected Murphy. (Pl.'s Opp'n, Ex. 23, Dep. of Rhonika Howard ["Howard Dep."] at 60.) The applications were then passed on to Schettler, who Lenox picked as a "subject matter expert" and who was asked to rank the candidates' written responses. (SOMF ¶ 5; Schettler Dep. at 22.) The parties do not dispute Schettler's method for ranking – assigning points for responses to questions according to "Factor Quality Level" criteria (SOMF ¶ 5) – although Perry alleges he "intentionally downgraded" her scores. (Pl.'s Resp. to Def.'s Undisputed Facts ["Pl.'s Resp."] ¶ 5.) Schettler arrived at four "best qualified" candidates: Murphy (Caucasian male, age 41), Perry (African-American female, age 51), Gina White (Caucasian female, age 42), and Wanza Lewis (African-American female, age

[3] Perry's 2005 performance review, given on June 10, 2005, noted that she attended a "Retirement Planning Seminar" as part of her training. (Pl.'s Opp'n, Ex. 3, 2005 Performance Appraisal Program ["2005 Eval."], at 7.)

[4] The parties dispute Howard's exact title, although her affidavit lists it as "Management & Program Analyst." (Def.'s Mot. for Summ. J., Aff. of Rhonika Howard ["Howard Aff."] ¶ 1.

51).  (Pl.'s Opp'n at 7.)  Schettler awarded Murphy 23 points, White 21 points, Lewis 17 points, and Perry 21 points.  (Def.'s Mot., Ex. C, Schettler Rankings, at 2.)

Perry and the other three candidates were then interviewed by a three-person panel, made up of Jimma Elliott-Stevens (38 years old, African-American, female), Deanna Wilson (50 years old, Caucasian, female) and George Eisenbach (48 years old, Caucasian, male).  (SOMF ¶ 11.) Lenox picked the members of the panel.  (*See* Pl.'s Opp'n, Ex. 25, Dep. of Jimma Elliott-Stevens ["Elliott-Stevens Dep."] at 25.)  Lenox did not provide the panel with the application packets or other supplemental materials for the candidates.  (*Id.* at 20.)  Howard testified that it was the "practice" to "provide [packets] for all interviews."  (Howard Dep. at 103.)  Elliott-Stevens testified that it was "strange" not to have the package, but that "even when I have the applications, quite honestly, I don't review them the way other people do."  (Elliott-Stevens Dep. at 20.)  Eisenbach testified that having the packages would have saved "much needed time" by allowing the panel to skip "extract[ing]" the information from the candidates during the interview.  (Pl.'s Opp'n, Ex. 26, Dep. of George Eisenbach ["Eisenbach Dep."] at 28.)

Elliott-Stevens testified that Murphy was the only candidate she was familiar with prior to the interview, and that "going into the panel, he was the person that [she] was probably rooting for, but just like any panelist should . . . , [she] based it solely on the record."  (Elliott-Stevens Dep. at 66.)  She stated that Murphy "did not come across strong in the interview," and that "[i]f [she] had not known him . . . [she] may have been a little bit more shocked" that he was picked, but that she knew his "work ethic and . . . what he was doing before he got the position[.]"  (*Id.*)  Elliott-Stevens also testified that she had been concerned that one of the

questions seemed too "specific" and that, because White was the only one to answer the question, she had assumed that "if this were preselection, it was for Gina White[.]"[5]  (*Id.* at 89.)

The panel awarded scores of 35/37,[6] 41, and 35 to Perry.  (Pl.'s Opp'n, Ex. 9.)  Lewis received scores of 43, 41/43,[7] and 38.[8]  (Pl.'s Opp'n, Ex. 10.)  Murphy received scores of 41, 35, and 34.[9]  (Pl.'s Opp'n, Ex. 11.)  White received scores of 43, 40, and 45.[10]  (Pl.'s Opp'n, Ex. 12.)  Perry was the only candidate to receive a score for every response.  The panel then submitted averaged scores to Lewis for her review, noting that White's average was 44.3, Lewis's was 43, Murphy's was 38.2, and Perry's was 36.8.[11]  (Pl.'s Opp'n, Ex. 13, at 4.)

The panel recommended that Lenox interview White and Lewis.[12]  (*Id.*)  Eisenbach wrote that, although he felt Lewis and White were the best candidates, all the candidates "were very knowledgeable on the technical side" and "kn[e]w their contracting business."  (*Id.* at 1.)  However, he testified that he was "surprised" that Lenox did not interview or hire White or

---

[5]  Elliott-Stevens's "shock" over Murphy being hired, which plaintiff refers to, was due to this initial assumption. "[I]f this were preselection, it was for Gina White, which, again, I – which is why I was so shocked that it was Don Murphy that was actually selected."   (Elliott-Stevens Dep. at 89.)

[6]  It is unclear, based on the photocopies provided, whether one of the numbers on one of the scoresheets is a 3 or a 5.  (Pl.'s Opp'n, Ex. 9, at 2.)

[7]  Again, the photocopies make it unclear what score Lewis received on one of the questions, although it is clear she was awarded some points by the remains of a circled score on the left edge of the page.  (Pl.'s Opp'n, Ex. 10, at 4.)

[8]  One of the panelists did not award Lewis points for one of her answers.

[9]  One of the panelists did not award Murphy points for one of his answers.

[10]  One of the panelists did not award White any points for one of her answers.

[11]  Plaintiff denies this (*see* Pl.'s Resp. ¶ 14), but this denial does not comply with Local Civil Rule 7 because it is not supported by a citation to record evidence.  *See* Local Civ. R. 7(h).  Thus, plaintiff has not raised any genuine issue with respect to this factual assertion by defendant.  *See Chavers v. Shinseki*, 667 F. Supp. 2d 116, 129 n.7 (D.D.C. 2009).

[12]  The parties dispute whether the final, averaged panel scores contain significant tabulation errors.  (Def.'s Mot. at 15; Pl.'s Opp'n at 18 n.7.)  Regardless of the specific score each party deserved, the three panel members reviewed and agreed with the way the four applicants were ranked and the difference in points between each.  (Pl.'s Opp'n, Ex. 13.)

Lewis. (Eisenbach Dep. at 55.) Wilson agreed that the candidates were all "technically proficient," although she felt that Murphy did not have the "management expertise or ease with the situations that the others did," and that his answers were "not as strong . . . on several of the questions." (Pl.'s Opp'n, Ex. 13, at 2.) Wilson emphasized that Lewis was "very impressive." (*Id.*). Perry concedes that none of the interview panelists discriminated against her. (SOMF ¶ 33; Pl.'s Resp. ¶ 33.)

On March 10, 2006, Lenox picked Murphy to be the Chief and issued a memorandum listing the reasons why she chose Murphy over the other applicants. (Pl.'s Opp'n at 1; Pl.'s Opp'n, Ex. 14, Lenox Memorandum ["Lenox Memo"] at 2.) Lenox wrote that she had "personal knowledge" of both White and Murphy, whom she labeled the "final top two candidates" based on their combined scores. (Lenox Memo at 2.) Lenox praised Murphy's "even temperament," "people skills," "management style," experience with working from a "remote location," and his "'real world' technical, supervisory and communication skills." (*Id.*) She noted that he "ranked number two" behind White, but criticized White's "somewhat authoritarian" style and suggested White would "benefit from further leadership experience." (*Id.* at 2-3.) Lenox noted that Lewis lacked experience supervising work in a "remote" environment, and was not as well versed in the "technical complexities" of the job. (*Id.*) Lenox did not mention Perry until the final paragraph of her memo. (*Id.*) She observed that Perry "was not recommended" by the panel, "ranked lowest" in the combined ratings, and had a management style that was "not well suited" for the job.[13] (*Id.* at 3.)

Howard testified that it was "unusual" for the selecting official not to follow the recommendation of the panel, but that "[i]t has happened." (Howard Dep. at 108.) In addition,

---

[13] Though Eisenbach expressed surprise that Lenox had selected Murphy, it was not because he thought Perry was the best candidate. (Eisenbach Dep. at 54-55.) Rather, he had assumed that Lenox would interview White and Lewis. (*Id.*)

she testified that she had never seen a similar memorandum or write-up for a selectee during her time in the HR department. (Howard Dep. at 110.) She also stated that she had never seen scores from an interview panel added together with the scores from the subject matter expert. (*Id.* at 99-100.) Howard testified that she was not surprised that Murphy had been selected, based on her "observation" and "feeling that [she] had." (Howard Dep. at 86.) However, Howard conceded that Lenox had "made a selection from" the "best qualified" list." (*Id.* at 113.)

Lenox admitted that the selection was a "very difficult decision" because she wanted "personally" to do "everything I can to raise women into high-level positions," and felt it was "important for me to justify . . . pick[ing] a man over a woman." (Lenox Dep. at 140.) She testified that she had difficulty picking someone over White, who "was the top person on the list" and received the highest rankings from the interview panel. (*Id.* at 139-40.) Lenox denied ever having the impression that Schettler "was hoping" Murphy would be promoted. (*Id.* at 141.)

After Lenox selected Murphy, Schettler wrote Murphy an e-mail congratulating him. (Pl.'s Opp'n, Ex. 15.) The entire text of the e-mail read: "Congratulations Don. It was only a matter of time. It's well deserved and NCA will be well served with you in a higher leadership position." (*Id.*)

## II.    PROCEDURAL HISTORY

Perry filed a formal complaint with the VA's Office of Resolution Management on June 12, 2006. (Def.'s Mot. Ex. F, Complaint of Employment Discrimination.) Her complaint stated that she "believe[d] that [she] was significantly better qualified for" the position "than the younger white, male selected." (*Id.* at 1.) The VA's Office of Employment Discrimination Complaint Adjudication issued a Final Agency Decision on April 1, 2009, which found that

Perry "failed to produce any persuasive evidence linking the actions of management . . . to her race, sex and age." (Def.'s Mot. Ex. G ["Final Agency Decision"] at 1.) Having exhausted her administrative remedies, Perry filed the instant suit on June 23, 2009. (Compl. ¶ 3; Answer ¶ 3.) The VA now moves for summary judgment.

**STANDARD OF REVIEW**

**I.      SUMMARY JUDGMENT**

A motion for summary judgment shall be granted "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (quoting Fed. R. Civ. P. 56(c)). "A dispute about a material fact is not 'genuine' unless the 'evidence is such that a reasonable jury could return the verdict for the nonmoving party.'" *Haynes v. Williams*, 392 F.3d 478, 481 (D.C. Cir. 2004) (quoting *Anderson*, 477 U.S. at 248). Thus, a moving party is entitled to summary judgment "against 'a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Waterhouse v. District of Columbia*, 298 F.3d 989, 992 (D.C. Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

As the non-moving party, Perry is "entitled to the benefit of all reasonable inferences from the evidence," and the evidence "is to be viewed in the light most favorable to" her. *Talavera v. Shah*, No. 09-5373, 2011 WL 1120285, at *2, *4 (D.C. Cir. Mar. 29, 2011). The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324; Fed.

R. Civ. P. 56(e). If the non-movant fails to point to "affirmative evidence" showing a genuine issue for trial, *Anderson*, 477 U.S. at 257, or "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (internal citations omitted). "While summary judgment must be approached with special caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Calhoun v. Johnson*, No. 95-CV-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998) (internal citation omitted), *aff'd* No. 99-5126, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 1999).

## II. CLAIMS UNDER TITLE VII AND THE ADEA

Title VII makes it unlawful for "an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . [or] sex[.]" 42 U.S.C. § 2000e-2. The ADEA similarly makes it "unlawful for an employer" to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). There are "two elements for an employment discrimination case: (i) the plaintiff suffered an adverse employment action (ii) because of the employee's race, color, religion, sex, or national origin." *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008). Perry "must prove both elements to sustain a discrimination claim." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).

Generally, plaintiffs may establish that their employer unlawfully took an adverse action against them in two ways. The "mixed motive" framework of *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), allows plaintiffs to show that a protected criterion was a "motivating" or "substantial" factor in the decision. *Johnson v. Holway*, 439 F. Supp. 2d 180, 223 (D.D.C.

2006).  Alternatively, under the "pretext" or "single motive" framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), plaintiffs argue that the sole reason for the adverse action was discrimination, and the employer's offered justification was pretextual.  *Nuskey v. Hochberg*, 730 F. Supp. 2d 1, 3 (D.D.C. 2010).  The *McDonnell Douglas* framework applies to claims brought under Title VII and the ADEA.  *See Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004).

## A.      Mixed-Motive Claims

The VA argues that Perry has brought suit solely based on a single-motive theory and, therefore, the standard for mixed motive claims is irrelevant to her Title VII claim.  (Def.'s Reply at 4 (citing *Ginger v. District of Columbia*, 527 F.3d 1340, 1345 (D.C. Cir. 2008).)  In *Ginger*, plaintiffs only presented evidence that discrimination was "a motivating factor" in the employment action, despite "never contend[ing]" that they had a mixed-motive case.  527 F.3d at 1345-46.  The Court held that plaintiffs had never argued that "race was one of multiple motivating factors," had only "brought a single-motive case" in which they argued that "race was the sole reason for the reorganization," and therefore could not argue a mixed-motive case at summary judgment.  *Id.*  A plaintiff with a "good faith evidentiary basis for asserting both theories," may argue both "until after both sides have presented their cases to the jury and the Court has evaluated the evidence."  *Nuskey*, 730 F. Supp. 2d at 4.  However, under *Ginger*, a single-motive claim does *not* "encompass" a mixed-motive claim, as Perry seems to believe (Pl.'s Opp'n at 15).  *See Ginger*, 527 F.3d at 1345-46.  *See also Ford v. Mabus*, 629 F.3d 198, 204, 207 (D.C. Cir. 2010) (plaintiffs can establish liability under § 633a of the ADEA in "one of two ways"; district court was "persuaded to apply a mixed-motives analysis" after first applying *McDonnell Douglas*).  Perry's complaint alleges that Lenox preferred Murphy and rejected Perry

"because of" race, "because of" gender, and "because of" age. (Compl. ¶¶ 40, 42, 45, 48.)

Moreover, Perry's opposition brief focuses solely on the VA's justifications and does not present

evidence suggesting that race, gender, or age were factors in the adverse action. Plaintiff has

neither alleged nor argued that she has a mixed motive claim. *See Ginger*, 527 F.3d at 1345.

The Court will therefore limit its analysis to the single-motive, *McDonnell Douglas* framework.[14]

### B.    The *McDonnell Douglas* Framework

In a disparate treatment case such as this one, where the employee has suffered an

adverse employment action and the employer has "asserted a legitimate, non-discriminatory

reason" for the action, the district court "need not—*and should not*—decide whether the plaintiff

actually made out a *prima facie* case under *McDonnell Douglas*." *Brady*, 520 F.3d at 492.

Instead, when deciding the employer's motion for summary judgment, the district court "must

resolve one central question" – "[h]as the employee produced sufficient evidence for a

reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual

reason and that the employer intentionally discriminated against the employee on the basis of

race . . . sex" or age? *See id.* Here, the parties do not dispute that Perry suffered an adverse

employment action. Thus, the Court will first determine whether the VA has asserted a

legitimate reason for the action, then address the "central question" of whether Perry has

produced sufficient evidence to establish both that the VA's reason was "not the actual reason"

*and* that the VA *intentionally discriminated* against her.

---

[14] As plaintiff has failed to allege a mixed motive claim, the Court need not consider the impact of a recent D.C. Circuit opinion, in which the Court held that a plaintiff bringing a mixed motive claim under the ADEA against a federal employer could prevail simply "by proving that age was a factor in the employer's decision." *Ford*, 629 F.3d at 206. The VA appears to agree with Perry that *Ford* "of course affects Plaintiff's burden of proof in this action with respect to her ADEA claim." (Def.'s Reply at 4.) The Court disagrees. *Ford* only used the "age was *a* factor" test to examine the plaintiff's mixed-motive claim. *See id.* at 204 (the district court wrongly applied a "but-for" standard after being "persuaded to apply a mixed-motives analysis"). As *Ford* makes clear, the *McDonnell Douglas* framework still applies in single-motive cases brought under the ADEA. *Id.* at 201-03.

## ANALYSIS

### I. EVIDENTIARY ISSUES

#### A. Concession By Perry

The VA suggests that because Perry stated that Lenox should have selected the "top recommendation of the panel," and because Perry was not the panel's top recommendation, that Perry has essentially conceded that she should not have been hired. (Def.'s Mot. at 12.) Defendant does not explain why this admission is "dispositive." (*Id.*) The relevant question for the Court is whether plaintiff has submitted evidence to prove that the VA's stated reasons for preferring Murphy are pretext and that the VA intentionally discriminated against Perry. Perry's subjective views on the hiring process are neither dispositive nor even relevant. *See, e.g.*, *Waterhouse v. District of Columbia*, 124 F. Supp. 2d 1, 7 (D.D.C. 2000) (plaintiff's "perception" of herself or her work performance is not relevant), *abrogated on other grounds by Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006).

#### B. EEOC Evidence

The VA asks the Court to "disregard all portions" of Perry's opposition that "cite[] and attack[] arguments" made by the Administration during the administrative proceedings. It argues that, because review of Perry's claims is *de novo*, the arguments made before the EEOC are irrelevant and should not be considered. (Def.'s Reply to Pl.'s Opp'n ["Def.'s Reply"] at 4.) The Court is, of course, "entitled to rely on the administrative record in a case brought under Title VII[.]" *Townsend v. Mabus*, 736 F. Supp. 2d 250, 253 (D.D.C. 2010). *See also Brookens v. Solis*, 635 F. Supp. 2d 1, 5 (D.D.C. 2009) ("the district court may consider the administrative record as evidence to be accorded whatever weight the court deems appropriate.") (quoting *Weahkee v. Perry*, 587 F.2d 1256, 1263 (D.C. Cir. 1978)). However, it is black letter law that

"lawyers' arguments are not evidence." *See United States v. Wilson*, 240 F.3d 39, 45 (D.C. Cir.

2001). Perry cannot establish discrimination by citing to lawyers' arguments made at the

administrative level. These arguments are inadmissible and are not evidence against the VA.

## II.     THE VA'S OFFERED JUSTIFICATION

The VA argues that Lenox chose Murphy because she concluded that he was the "best-

qualified candidate." (Def.'s Mot. at 10.) A "qualifications-based justification constitutes a

legitimate, nondiscriminatory reason" for the allegedly discriminatory action. *Holcomb*, 433

F.3d at 896. In support of this claim, the VA cites Schettler's ranking of Murphy as having the

"most technical expertise and relevant background experience," Lenox's experience with

Murphy and knowledge of his "understanding" of the IT systems and his "experience and ability

to supervise employees in a virtual environment," and the value Lenox placed on his "even

temperament" and "people skills." (Def.'s Mot. at 10.) The VA also points to Murphy's

experience working from a remote location, his military experience, and Lenox's personal

evaluation of his "technical, supervisory, and communications skills[.]" (*Id.* at 10-11.) The VA

also argues that Lenox had a nondiscriminatory reason for choosing Murphy over Perry because

Perry received low scores from Schettler and the panel and had a supervisory style that was a

"bad fit." (*Id.* at 11.) The VA's qualifications-based justifications are legitimate,

nondiscriminatory reasons for choosing Murphy over Perry. The Court will therefore turn to the

evidence submitted by Perry.

## III.     PERRY'S EVIDENCE OF PRETEXT AND DISCRIMINATION

Perry attacks the VA's explanation for Murphy's promotion and suggests that, by

establishing that this explanation is pretextual, she can end the Court's inquiry. (*See, e.g.*, Pl.'s

Opp'n at 20-21.) The Court must assess Perry's challenge to the VA's explanation "in light of

the total circumstances of the case," *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1291 (D.C. Cir. 1998) (en banc), keeping in mind that "[i]t is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). *See also Fischbach v. Dist. of Columbia Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (the Court's inquiry focuses on whether the VA "honestly believes in the reasons it offers"). The Court addresses, in turn, Perry's arguments that (A) she was better qualified for the job; (B) Lenox considered impermissible "subjective factors"; (C) Lenox made discriminatory comments to her; (D) procedural issues that Perry has identified are evidence of pretext; (E) Lenox impermissibly considered factors beyond those listed in the KSAOs; (F) preselection occurred, and (G) statistical evidence is reflective of pretext.

## A.     Qualifications Gap

Perry can establish pretext if she can demonstrate that "a reasonable employer would have found the plaintiff to be significantly better qualified for the job." *Aka*, 156 F.3d at 1294. However, if the evidence does not show the "'stark superiority' of plaintiff's credentials over those of the successful" applicant, the Court will not infer pretext or discrimination. *McIntyre v. Peters*, 460 F. Supp. 2d 125, 136 (D.D.C. 2006) (quoting *Stewart v. Ashcroft*, 352 F.3d 422, 429 (D.C. Cir. 2003)). Moreover, Perry's "own self-perception of her credentials" are "irrelevant for purposes of establishing discriminatory . . . conduct." *Talavera v. Fore*, 648 F. Supp. 2d 118, 136 (D.D.C 2009), *rev'd in part on other grounds by Talavera v. Shah*, 2011 WL 1120285, at *7; *accord Waterhouse*, 124 F. Supp. 2d at 7. Perry argues that she was the better choice for the position because the panel awarded her a score that was one point higher than Murphy's, and because, had Schettler graded her form appropriately, her "best qualified" score would have been

slightly higher than Murphy's.  (Pl.'s Opp'n at 25.)  This is hardly the sort of "stark superiority" that would allow a reasonable juror to infer the presence of discrimination.  Plaintiff has failed to even come close to showing the sort of "wide and inexplicable" gap in qualifications required for the Court to infer discrimination.  *See Lathram v. Snow*, 336 F.3d 1085, 1091 (D.C. Cir. 2003).  Therefore, there is no inference of pretext on these grounds.

### B.      Subjectivity

Perry argues that the VA selected Murphy over Perry for subjective reasons, which this Court should view skeptically.  (Pl.'s Opp'n at 17.)  Although the Court treats "explanations that rely heavily on subjective considerations with caution," employers "may of course take subjective considerations into account in their employment decisions."  *Aka*, 156 F.3d at 1298.  However, absent evidence that the subjective judgment of the selecting officer is inaccurate or incorrect, a reasonable jury cannot infer pretext from the use of selective factors.  *Carter*, 387 F.3d at 879-80 (positive description of plaintiff's behavior from later interview was insufficient to allow reasonable jury to infer that defendant's subjective claims were pretextual).  Perry neither presents affirmative evidence to show that Lenox's assessment was inaccurate or incorrect, nor offers a "sufficiently concrete description" of her management style to counter Lenox's subjective judgment.[15]  Thus, a reasonable juror could not infer that Lenox's reasons were pretextual simply because she took subjective factors into account.

Moreover, the VA has submitted additional, objective reasons to justify its decision.  Where "reliance" on subjective reasons "is modest, and the employer has other, well-founded reasons for the employment decision, summary judgment for the defendant may be appropriate."  *Aka*, 156 F.3d at 1298.  Here, in addition to subjective justifications such as "management style"

---

[15] Perry states, without explanation, that Lenox never directly supervised Perry.  (Pl.'s Opp'n at 31.)  Plaintiff does not argue, however, that Lenox lacked direct knowledge of Perry, or that Lenox needed to directly supervise Perry in order to judge her supervisory style.

and "temperament," Lenox presented more objective reasons for selecting Murphy, such as the high ranking he received from the subject matter expert, his unique experience, and his history of military service. Thus, the subjectivity of some of the VA's criteria does "not require a denial of defendant's motion." *Bennett v. Solis*, 729 F. Supp. 2d 54, 67 (D.D.C. 2010) (agency entitled to summary judgment despite subjective considerations where agency also presented "legitimate and non-discriminatory reason" for adverse employment action).

Perry argues that Lenox did not actually pay attention to numerical rankings or, indeed, give them "much thought during the decision-making process," thus suggesting that her references to the rankings is pretextual. (Pl.'s Opp'n at 19-20.) This argument misrepresents the record. Lenox testified that she "was looking at the numbers" and that she did not recall whether she attached "significance" to small differences in scores between the candidates. (Lenox Dep. at 137-38.) She neither said nor implied that she did not "attach much importance to numerical rankings." (*Compare id. with* Pl.'s Opp'n at 19.) Her deposition testimony is entirely consistent with the memo setting forth her justifications for selecting Murphy, in which she makes references to where the candidates rank but does not discuss their respective scores. (*See* Lenox Memo.)

Perry next argues that if she was not hired because of her ratings, then Murphy should also have been disqualified. (Pl.'s Opp'n at 17-20.) Perry misreads the VA's brief to suggest that the entire basis for hiring Murphy and rejecting Perry were the scoring results. (*Id.* at 19.) Plaintiff constructs an entire argument based on this faulty premise, arguing that Lenox's method of combining the scores from Schettler and the panel was "entirely specious" and therefore could support an inference of discrimination. (*Id.* at 20.) However, the VA never claimed that the scores were the only reason Lenox selected Murphy and did not select Perry. Rather, it

introduced as evidence Lenox's contemporaneous memorandum which contains numerous other justifications for selecting Murphy, including his experience working from remote locations, his military experience, and his strong leadership abilities and "even temperament." (Lenox Memo at 2-3.) Perry lacked Murphy's extensive military experience and experience supervising remote locations. Lenox also identified Perry's supervisory style as being unsuited to the job. (*Id.* at 2.) Moreover, it is undisputed that panel ranked Perry below Murphy. (Def.'s Mot., Ex. E.) Perry "fails to identify any evidence from which a reasonable jury could conclude" that the VA was "substantively inaccurate or dishonest[]" in asserting that Lenox chose Murphy, in part, because of the rankings. *Pearsall v. Holder*, 610 F. Supp. 2d 87, 101 (D.D.C. 2009).

Therefore, no reasonable juror could determine that Lenox's reasons were pretextual on the grounds that the final decision was not based solely on the rankings.

## C. Stray Remark

Perry argues that a single comment made by Lenox to Perry during her performance review meeting on December 9, 2005, three months before Perry applied for the Chief of Operations position, is evidence of age discrimination.[16] (Pl.'s Opp'n at 5, 33.) The VA argues that this is a "stray remark" that does not create a triable issue of discrimination. (Def.'s Mot. at 20-21.) "'[S]tray remarks,' even those made by a supervisor, are insufficient to create a triable issue of discrimination where . . . they are unrelated to an employment decision involving the plaintiff." *Simms v. U.S. Gov't Printing Office*, 87 F. Supp. 2d 7, 9 n.2 (D.D.C. 2000). *See also Sewell*, 532 F. Supp. 2d at 139 n.8. Perry claims that when she told Lenox that she planned to

---

[16] Perry also suggests that Lenox's alleged statement that Perry was "in the position that was best suited to her skills" is evidence of discrimination. (Pl.'s Opp'n at 33.) Even if this statement were meant to discourage Perry from applying to be the Chief, plaintiff has failed to connect it to any sort of discriminatory motive. Moreover, Perry herself testified that Lenox said this before either of them discussed the new job opening. (Pl.'s Opp'n, Ex. 21, Agency's Mot. for Summ. J., Ex. 1 at 93.) No reasonable jury could find that this statement could raise an inference of discrimination. *See Sewell v. Chao*, 532 F. Supp. 2d 126, 139 n.8 (D.D.C. 2008) (where no "nexus" exists between comments and the decision-making process, the comments do not support a discriminatory motive).

apply to be Chief, Lenox asked her how many years she had until retirement. Lenox was the ultimate decision-maker, and her statement was allegedly made in direct response to Perry bringing up the job opening. However, the Court cannot view this as evidence of discriminatory animus.

First, this comment hardly suggests discrimination based on age. *See Shipman v. Vilsack*, 692 F. Supp. 2d 113, 118 & n.5 (D.D.C. 2010) (no evidence of unlawful discriminatory intent where supervisor made *repeated* inquiries about retirement plans). "Ambiguous statements cannot be stretched to mean whatever some one wants them to mean . . . ." *Lucas v. Paige*, 435 F. Supp. 2d 165, 171 (D.D.C. 2006) (Facciola, Mag. J.). Second, at the time this statement was made, Lenox was 52 years old and a member of the same protected class as Perry, (Pl.'s Opp'n, Ex. 21, Agency's Mot. for Summ. J., at 4), which "weighs further against an inference of discrimination." *Kelly v. Mills*, 677 F. Supp. 2d 206, 223 (D.D.C. 2010). Thus, Lenox's single statement, wrenched from its context, cannot support an inference that she discriminated against Perry based on age.[17]

### D.     Selection Process

Perry suggests that the VA's explanation is pretext because Lenox and Schettler "steer[ed] the position" to Murphy by means of a "fishy" selection process. (*Id.* at 26, 36.) A violation of protocol "may" be probative of the employer's "true motivation" if (1) the violation is suspicious, in and of itself, *Downing v. Tapella*, 729 F. Supp. 2d 88, 97-98 (D.D.C. 2010) (citing *Salazar v. Wash. Metro. Transit Auth.*, 401 F.3d 504, 509 (D.C. Cir. 2005)), (2) the agency "inexplicably departed" from its normal procedures, *id.* (citing *Lathram*, 336 F.3d at

---

[17]   The VA also argues that a panel member's comment that Perry had "been around a long time" is not evidence of age discrimination. (Def.'s Mot. at 22 (citing *Beatty v. Wood*, 204 F.3d 713, 716 (7th Cir. 2000)). Because Perry does not respond to this argument, the Court will treat it as conceded. *See Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003).

1093), or (3) the violation inherently raises credibility questions. *Id.* (citing *McIntyre*, 460 F. Supp. 2d at 138). A violation does not, however, "create a *per se* inference of a Title VII violation." *Downing*, 729 F. Supp. 2d at 97. Thus, an "overhaul" of selection criteria, carried out by an employee who had already been found to have retaliated against plaintiff, did not indicate pretext because (1) the overhaul itself affected all the applicants equally and there was no indication of discrimination in the circumstances or text of the criteria (and, therefore, there was nothing inherently suspicious about them), and (2) because it was not "so irregular or inconsistent with" established policies (and, therefore, such an inexplicable departure) as to make the defendant's explanation "unworthy of belief." *See Porter v. Shah*, 606 F.3d 809, 816 (D.C. Cir. 2010) (internal quotation marks omitted). The Court will first consider whether the alleged violations of procedure were inherently suspicious, and it will then address whether the agency "inexplicably departed" from its normal procedures.

### 1. Inherently Suspicious Violation (*Salazar*)

In *Salazar*, the plaintiff had asked a supervisor to select the members of his interview panel because he believed that Lewis, another supervisor, selected biased panel members in order to discriminate against Latinos. *Salazar*, 401 F.3d at 506. The plaintiff had also filed a grievance in the past against Lewis, alleging racial discrimination. *Id.* Nevertheless, Lewis was allowed to chose one of the members of the panel and to help draft and assign weights to the different interview questions. *Id.* at 506-07. The Court also noted that the candidate eventually chosen by the panel never held the job, and was instead transferred to a lesser position. *Id.* at 509. The Court determined that, although it was a "close call," Lewis's "unexplained participation" and the chosen candidate's transfer would allow a reasonable jury to find that the process was not "fairly designed" and that, therefore, the defendant's explanation was pretextual.

19

*Id.* Thus, although *Salazar* establishes that the "*specific* process" used by an employer may support a finding of pretext, it does not hold that mere irregularities alone will suffice. *Id.*

As in *Porter*, and unlike in *Salazar*, Perry has failed to present evidence that the changes in procedure were inherently discriminatory. Her evidence that the selection process was "fishy" largely derives from the testimony of Rhonika Howard, an employee in the VA's human resources department. Howard testified that she had "never seen" a selecting official combine scores or produce a selection memo, as Lenox did, that failing to follow the panel's recommendation was unusual, and that she believed that Lenox's failure to provide the panel with application packages was "odd." (*Id.* at 26-28.) However, there is nothing inherently discriminatory in either the text of the memo or in the various circumstances Howard describes. Nor is there any hint that Lenox (or anyone else involved in the review process) had been accused of discrimination in the past, no indication that Lenox "'placed h[er]self squarely at the center of a process designed to exclude [her],'" and no evidence that Lenox attempted to improperly influence the panel.[18] *See Salazar*, 401 F.3d at 509. "[A]lthough plaintiff's evidence may show the process to be imperfect, her evidence is not sufficient to establish that defendant's preferred explanation is pretextual absent some actual evidence that defendant acted on a motivation to discriminate against plaintiff based on her age, race or sex." *Oliver-Simon v. Nicholson*, 384 F. Supp. 2d 298, 312 (D.D.C. 2005). *See also Mason v. DaVita, Inc.*, 542 F. Supp. 2d 21, 34 (D.D.C. 2008) (no reasonable jury could find discrimination despite allegations that hiring process was "fishy" where "[n]othing in the record intimates" that the process was "tainted by race discrimination"). Thus, no reasonable jury could infer that the process was so "inherently suspicious" as to raise an inference of discrimination.

---

[18] Although Perry filed an EEO complaint against Wayne Simpson in the mid 1990s (Perry Decl. ¶ 29), it is uncontested that he played no role in the selection process, and thus, this issue is not material. (*See* Def.'s Reply at 16-17 n.14.)

## 2.  Inconsistent With Established Policies

Furthermore, Perry has failed to establish that Lenox's acts were so inconsistent with established policies as to make the VA's explanation unworthy of belief.  The source of this doctrine is *Lathram v. Snow*, a D.C. Circuit case in which the U.S Customs Service inexplicably decided to allow non-Customs employees to apply for the position of Press Director.  336 F.3d at 1092-93.  At the same time, it refused to allow non-Customs employees to apply for two other directorships that were created at the same time.  *Id.*  As a result, a male applicant from outside Treasury received a "veteran's preference" and was chosen over the plaintiff to be Press Director, though Lathram had received a perfect rating.  *Id.*  The government submitted no "evidence in the record" to explain why it chose to open that specific position while refusing to do the same for the other directorships, which were also filled by men.  *Id.* at 1094.  The Circuit found this "unexplained inconsistency" could justify an inference of discriminatory motive.  *Id.* at 1093.  *Porter* then clarified *Lathram* by requiring any alleged inconsistencies to be "so irregular . . . with . . . established policies as to make [the agency's] hiring explanation unworthy of belief."  *Porter*, 606 F.3d at 816.

Perry has not satisfied this test, since any "unexplained inconsistenc[ies]" are not "so irregular" as to make the VA's explanation unworthy of belief.  *See Porter*, 606 F.3d at 816.  Based on Howard's testimony, Perry argues that there are four "inconsistencies": 1) Lenox's decision to write a selection memo; 2) Lenox's decision not to follow the panel's recommendation; 3) Lenox's decision to combine scores; and 4) Lenox's decision not to provide the panel with the application packages.  (Howard Dep. at 100, 103, 108, 110).  Lenox explained, however, that she drafted the memorandum in order to better explain a "very difficult decision" and to explain why she was choosing a male candidate, as opposed to a female, Gina White, who

was rated highest by the panel. (Lenox Dep. at 139-40.) Moreover, Howard testified that selecting officers do, on occasion, disregard panel recommendations (Howard Dep. at 108), and Lenox has submitted numerous legitimate reasons for choosing Murphy rather than one of the panel's recommended choices. Thus, unlike the agency in *Lathram*, Lenox has offered explanations, under oath, for two of the acts, one of which, according to Howard, is not even particularly unusual. Perry has failed to undercut these explanations with any contrary evidence. Because these acts are not "inexplicable," they do not permit a reasonable jury to infer discrimination without further evidence that Lenox was actually "motivated by discrimination." *See Downing*, 729 F. Supp. 2d at 98.

Lenox has not, however, explained her failure to provide application packets to the panel members and her decision to combine the scores from the panel and Schettler's evaluations. But these acts do not satisfy *Porter* because they were not "so irregular" as to make the agency's justification "unworthy of belief." The plaintiff in *Lathram* showed that Customs had opened up three directorships, kept two of the positions closed to non-Customs employees, opened only the position she had applied for (without any explanation), and hired men to fill all three positions. *Lathram*, 336 F.3d at 1093. The "unusual" and "unexplained" acts here do not approach that level of irregularity, for failing to provide application packets or combining evaluation scores do not render the explanation that Murphy was the most qualified applicant "unworthy of belief."[19] *See Hampton v. Vilsack*, Civ. No. 07-2221, 2011 WL 108383, at *12 (D.D.C. Jan. 13, 2011) (minor irregularities were "simply not enough from which to reasonably infer that" the employer's "true motivation for [its] treatment of [plaintiff] was" discriminatory). Thus, because

---

[19] The Court need not consider whether Childs' affidavit is admissible, because it establishes only that it was "permissible" for Lenox to combine the scores of the subject matter expert with the scores of the panel, and does not address whether it was consistent with established procedures. (Def.'s Opp'n, Aff. of R. Steven Childs ¶ 13.) A Court may infer pretext from "unexplained inconsistenc[ies]" without proof that the agency violated regulations. *See Lathram*, 336 F.3d at 1094.

Perry has also failed to introduce evidence that "discrimination played any role in" these alleged violations of agency procedures, they do not "implicate" Title VII or the ADEA.[20] *Downing*, 729 F. Supp. 2d at 98 (technical violations insufficient where plaintiff introduced no evidence that they were motivated by discrimination).

### E.    Criteria Beyond KSAOs

Perry also argues that the VA's explanation is pretextual because Lenox considered factors that were not listed in the KSAOs. Lenox offers Howard's testimony as evidence that Lenox's knowledge of Murphy's capabilities (Pl.'s Opp'n at 28), his even temperament (*id.*), her opportunities to observe his skills (*id.* at 29), his status as a veteran and her belief that Perry had an unsuitable supervisory style (*id.* at 30) should have been irrelevant because they were not included in the description of the job requirements or were otherwise "unfair." The Court is mindful that "Title VII . . . does not authorize a Federal court to become a 'super-personnel department that reexamines an entity's business decisions[.]'" *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting *Dale v. Chi. Trib. Co.*, 797 F.2d 458, 464 (7th Cir. 1986)). *See also Fischbach*, 86 F.3d at 1183 (court may not "second-guess an employer's personnel decision absent demonstrably discriminatory motive") (quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982)). Moreover, as the Circuit has noted, "reasonable employers" are not limited to a "mechanistic checkoff of qualifications required by the written job descriptions." *Jackson v. Gonzales*, 496 F.3d 703, 709 (D.C. Cir. 2007) (quoting *Aka*, 156 F.3d at 1297 n.15). Thus, no inference of discrimination is raised when an employer "base[s] its ultimate hiring decision on one or more specific factors encompassed within a broader and more general job description." *Jackson*, 496 F.3d at 709. The job description provided by the VA notes that the

---

[20] Indeed, given that Murphy received the highest marks during Schettler's review of the applications, he may have suffered most from having his application withheld from the panel, especially because his interview skills, according to Lenox, were not very strong. (Lenox Memo at 2.)

Chief's responsibilities include supervision of fifty-five employees, including "employees in five remote processing sites." (Def.'s Mot., Ex. A ("Job Description"), at 2). Thus, Murphy's experience with remote locations and his superior management style were clearly relevant factors. Moreover, Lenox's selection memorandum also provides uncontroverted reasons why Murphy's significant military experience was useful. (Lenox Memo at 1-3.) Because the factors Lenox considered were encompassed in the job description and were clearly useful to performance of the job, Perry cannot overcome summary judgment on this basis.

Perry also argues that it is "revealing" and "very relevant" that Lenox only noted Murphy's military experience when comparing him to Lewis and White. (*Id*. at 29-30.) But Perry again has provided no evidence to contradict Lenox's explanation that she did not view Perry on the same level as Murphy, White, or Lewis, because of her management style and overall low scores, and therefore did not need to take Perry's more limited military service (as compared to Murphy's) into account in making her decision. (Lenox Memo at 3.) Moreover, as noted above, Perry has failed to connect Lenox's consideration of military service to any kind of discriminatory motive. Thus, no reasonable juror could find that Lenox's failure to make reference to Perry's military record in her selection memorandum indicates pretext.

### F. Preselection

Perry argues that the VA's explanation is pretextual because Murphy was Schettler's "right hand man" and was pre-selected for the position. (Pl.'s Opp'n at 20-21.) Perry has produced evidence suggesting that, in 2001, Schettler recommended Murphy for a job (*id.* at 26 n.10), that Schettler and Lenox thought Murphy was valuable to the VA (Pl.'s Opp'n at 21, 23), that Lenox selected Schettler to review the qualified candidates knowing that Schettler and Murphy had a close relationship (*id.* at 21) and that Schettler congratulated Murphy on his

promotion (*id.* at 25).[21]  Plaintiff also alleged that Schettler told Perry that he did not score the applications, when, in fact, he had.  (*Id.*)  Plaintiff also expends considerable effort arguing that Schettler improperly scored Perry's application, awarding her fewer points than she deserved.[22]  (*Id.* at 22-25.)

In other words, Perry argues that, although Schettler was not the ultimate decision-maker, he orchestrated the hiring process in order to ensure that Murphy, his chosen candidate, was selected.  (Pl.'s Opp'n at 21-25.)  The Supreme Court recently held that an employer will be liable for discrimination against the military where a supervisor "performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action" if "that act is a proximate cause of the ultimate employment action," even if a different, "ultimate decisionmaker[] exercise[s] . . . judgment."  *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1192-94 (2011).  Here, however, there is no evidence that Schettler had any discriminatory animus or bias against Perry.  Other than Schettler's innocuous congratulatory e-mail to Murphy, Perry's only "evidence" in support of her "cat's paw" theory is her argument that she should have received higher scores from Schettler.  But Perry's own subjective assessment of her performance is irrelevant.  *Stoyanov v. Winter*, 643 F. Supp. 2d 4, 14 (D.D.C. 2009); *Felder v. Johanns*, 595 F. Supp. 2d 46, 70 (D.D.C. 2009).  Nor is it clear "on its face" that Murphy's responses were inferior to Perry's, so "it is not the Court's place to second-guess [Schettler]'s preference for one response over the other."  *Chavers*, 667 F. Supp. 2d at 131 n.10.  Therefore, her "cat's paw" theory fails.

---

[21]  Perry argues that Lenox's "good faith" is called into question because, in an affidavit, Perry claimed that Lenox praised Murphy's supervisory skills despite not supervising him in a management position.  (Pl.'s Opp'n at 29.)  Even if Perry's allegation were true, Lenox could easily have observed Murphy's management style despite not being his formal supervisor.  Perry's self-serving statement alone does not create an issue of material fact.

[22]  Perry does not argue that she received lower-than-deserved rankings because of discrimination.  Rather, she argues only that the rankings are evidence of Schettler's bias toward Murphy and, therefore, that the VA's justifications are pretextual.  (Pl.'s Opp'n at 21-26.)

Plaintiff also argues that Lenox directly pre-selected Murphy for the promotion, and that the VA's offered explanation is therefore pretextual. (Pl.s' Opp'n at 21-33.) "Pre-selection, regardless of its propriety, is only relevant to this lawsuit inasmuch as plaintiff can demonstrate that the pre-selection itself was discriminatorily motivated." *Downing*, 729 F. Supp. 2d at 97. *See also Kolstad v. Am. Dental Ass'n*, 139 F.3d 958, 969 (D.C. Cir. 1998) ("evidence of pre-selection is relevant only insofar as it logically supports an inference of discriminatory intent"), *vacated on other grounds by* 527 U.S. 526 (1999). As this Court has previously noted, the D.C. Circuit distinguishes between underlying claims of discrimination and allegations of pre-selection that "do not directly suggest discrimination." *Downing*, 729 F. Supp. 2d at 97 (collecting cases). This is especially true where, as here, "the selection is to be made from among a narrow band of current employees well known to the selectors." *Kolstad*, 139 F.3d at 969. Perry argues that the "strange manner" in which Lenox conducted the process, *see supra* Part III.D, is evidence that Lenox was "steering" the position toward Murphy. (Pl.'s Opp'n at 26.) Again, however, because of Perry's failure to produce evidence that Lenox's decision was "based on a motive prohibited by Title VII or ADEA, the conduct is not actionable." *Oliver-Simon*, 384 F. Supp. 2d at 310. Thus, the pre-selection claim does not "implicate Title VII." *Downing*, 729 F. Supp. 2d at 98.

### G. Statistical Evidence

Perry offers a conclusory statement by one of the panel members that African-Americans are underrepresented in management at the Agency as evidence of the "factors at play in deciding who would be Chief," presumably intending for the Court to infer the existence of discrimination on the basis of a suggestion of statistical evidence. (Pl.'s Opp'n at 33.) However, evidence that consists solely of the "subjective impressions of current" employees provides "no

basis from which the Court may draw an inference of discrimination."[23] *Simpson v. Leavitt*, 437

F. Supp. 2d 95, 104 (D.D.C. 2006). Perry provides no other information that would allow the

Court to determine whether the Agency "employs African-Americans at rates significantly below

their number in the applicant pool or general population." *Id.* Thus, this statement does not

allow the Court to infer the presence of discrimination.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment [Dkt. No. 24] is

granted. An Order consistent with this Memorandum Opinion is also being issued this date.

_____/s_____
ELLEN SEGAL HUVELLE
United States District Judge

Date: May 10, 2011

---

[23] Although Perry has attached a summary of an EEO report on the National Cemetery Administration as an exhibit, she does not cite to it as evidence of discrimination in her brief. Indeed, the report suggests that "promotions are roughly proportionate to the representation in the leadership pipeline of grades 13-15 and in grades 3-12 with the exception of Asian men." (Pl.'s Opp'n, Ex. 27, EEO Report, at 12.)